UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL RAYMOND HABSCHIED,

                Plaintiff,

      v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

_____

<u>DECISION & ORDER</u>

17-CV-6217P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Paul Raymond Habschied ("Habschied") brings this action pursuant to Section 205(g) of the Social Security Act , 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 18).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 13, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and accords with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Habschied's motion for judgment on the pleadings is denied.

# DISCUSSION

## I. Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)     whether the claimant is currently engaged in substantial gainful activity;
>
> (2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.    Habschied's Contentions

Habschied contends that the ALJ's determination that he is not disabled is not supported by substantial evidence. (Docket ## 13, 17). Habschied maintains that the ALJ's physical Residual Functional Capacity ("RFC") assessment is not based upon substantial evidence because he improperly weighed the medical opinions of record. (Docket ## 13-1, 17). According to Habschied, the ALJ erred by according "great weight" to the opinion of Sharon R. Kahn ("Kahn"), PhD. (Docket ## 13-1 at 19-26; 17 at 2-3). Habschied maintains that Kahn's opinion is stale and not supported by the evidence she relied upon, nor by the record as a whole. (*Id.*). He also maintains that Kahn is a biased witness. (Docket # 17 at 1-2).

Habschied makes a similar argument with respect the ALJ's determination to give "great weight" to the opinion of agency medical consultant E. Selesner ("Selesner"), maintaining that it was not based upon a review of the complete medical record, and, in any event, the ALJ failed to account for all of the limitations assessed by Selesner. (Docket # 13-1 at 26-27). Finally, Habschied contends that the ALJ improperly discounted several opinions submitted by his treating psychiatrist, Muhammad Cheema ("Cheema"), MD, and the opinion authored by state examining consultant Yu-Ying Lin ("Lin"), PhD. (Docket ## 13-1 at 29-33; 17 at 3-5). He also maintains that the ALJ failed to account for limitations in Cheema's most recent opinion, despite purporting to give that opinion "great weight." (*Id.*).

## III.  <u>Analysis</u>

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)).[1]  Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) (summary order) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician[] because the treating physician has observed the patient over a longer period of time and is able to

---

[1]  This regulation applies to claims filed before March 27, 2017.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

give a more detailed picture of the claimant's medical history." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1) the frequency of examination and length, nature, and extent of the treatment relationship,

(2) the evidence in support of the physician's opinion,

(3) the consistency of the opinion with the record as a whole,

(4) whether the opinion is from a specialist, and

(5) whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992 at *4. The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *Id.*

Lin conducted a psychiatric evaluation of Habschied on April 24, 2014. (Tr. 325-28).  Habschied drove himself to the appointment and reported that he lived with his parents.  (*Id.*).  Habschied also reported that he had graduated from high school in a regular educational setting.  (*Id.*).  Habschied's previous employment as a truck detailer lasted for eleven years and ended in March 2014 after he failed a drug test.  (*Id.*).

Habschied reported that he had been receiving ongoing mental health treatment from Cheema for approximately ten years, but had not been hospitalized for psychiatric treatment.  (*Id.*).  According to Habschied, he had no difficulty sleeping, but had experienced a loss of appetite.  (*Id.*).  Habschied reported depressive symptoms that had worsened since he lost his employment.  (*Id.*).  He endorsed dysphoric moods, psychomotor agitation, loss of usual interests, fatigue, diminished self-esteem, and social withdrawal.  (*Id.*).  He reported that he frequently lacked energy to care for his personal hygiene.  (*Id.*).  He also endorsed anxiety-related symptoms since March 2014, including restlessness, difficulty concentrating, muscle tension, and fatigue.  (*Id.*).  Habschied indicated that his anxiety worsened around large groups of people.  (*Id.*).  He also endorsed manic symptoms for the previous ten years, including being more talkative and distractible, a decreased need for sleep, and an increased goal-directed activity.  (*Id.*).  Although he reported experiencing these symptoms approximately three times a week, he last experienced the symptoms in March 2014 and could not identify the duration of the symptoms.  (*Id.*).  He also complained of short-term memory difficulties.  (*Id.*).

Habschied reported that he had used marijuana for the previous twenty-nine years and last used it three months earlier.  (*Id.*).  According to Habschied, he was able to care for his personal hygiene and perform household chores, including cooking, cleaning, laundry, and shopping, although he frequently lacked motivation to complete these tasks due to depression.

(*Id.*).  He reportedly showered once every two to three weeks.  (*Id.*).  He reported that he was able to drive and to take public transportation.  (*Id.*).  Habschied indicated that his parents assisted him when needed and that he spent his days watching television and movies and assisting around the house.  (*Id.*).

During the interview, Lin noted that Habschied's demeanor was cooperative and his manner of relating was adequate.  (*Id.*).  Upon examination, Habschied was well-groomed and dressed casually, had lethargic motor behavior and normal posture and eye contact.  (*Id.*).  Lin opined that Habschied had fluent, clear speech with adequate language, coherent and goal-directed thought processes, a depressed affect, a dysthymic mood, clear sensorium, full orientation, and below-average intellectual functioning with a general fund of information that was appropriate to experience.  (*Id.*).  Lin noted that Habschied's attention and concentration were mildly impaired due to depression.  (*Id.*).  Habschied was able to perform simple counting and calculations, but made a mistake at the end of the serial three exercise.  (*Id.*).  According to Lin, Habschied's recent and remote memory skills were moderately impaired due to anxiety and depression.  (*Id.*).  Habschied could recall three out of three objects immediately and two out of three objects after a delay, and could complete six digits forward and three digits backward.  (*Id.*).

Lin opined that Habschied could follow and understand simple directions, perform simple tasks independently, learn new tasks, and perform complex tasks with supervision.  (*Id.*).  Lin further opined that Habschied had moderate limitations in his ability to maintain attention, concentration, and a regular schedule and was mildly limited in making appropriate decisions and relating adequately with others.  (*Id.*).  Lin further opined that Habschied was markedly limited in his ability to appropriately deal with stress.  (*Id.*).  According

to Lin, Habschied's difficulties were caused by fatigue and stress-related problems. (*Id.*). Lin diagnosed Habschied with adjustment disorder with mixed anxiety and depressed mood, bipolar II disorder, and cannabis use disorder in remission, and opined that his prognosis was guarded to fair and he would need assistance to manage his funds. (*Id.*).

On May 8, 2014, after completing a review of the medical records available at that time, which included Lin's report as well as Cheema's treatment notes, Selesner opined that Habschied suffered from medically determinable impairments of affective disorder and substance addiction disorder, but did not meet or equal a listed impairment. (Tr. 62-64). According to Selesner, Habschied suffered from moderate limitations in his ability to engage in activities of daily living and to maintain social functioning and concentration, persistence or pace. (Tr. 64). Selesner completed a RFC assessment. (Tr. 65-69). Selesner opined that Habschied suffered from moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. (*Id.*). According to Selesner, Habschied was able to follow supervision but would "likely benefit from a work setting in which he would have limited interactions with co-workers." (*Id.*).

Treatment records demonstrates that Cheema provided ongoing psychiatric treatment to Habschied beginning in July 2008 and continuing through the date of the administrative hearing. (Tr. 50, 331-80). The records also demonstrate that Habschied

participated in a rehabilitation program at Strong Recovery between June 2015 and continuing through the date of the administrative hearing. (Tr. 508-989). He routinely met with Judith Hogan ("Hogan"), LMHC, for individual counseling sessions. (*Id.*).

Between July 2014 and April 2016, Cheema authored four opinions assessing Habschied's work-related physical limitations. (Tr. 381-83, 384-88, 389-92, 393-96). The first three opinions were contained on forms entitled Psychological Assessment for Determination of Employability for the Monroe County Department of Human Services. (Tr. 384-96). They were dated July 16, 2014, February 18, 2015, and September 25, 2015, and the February 2015 opinion was co-endorsed by Hogan. (*Id.*). Generally, Cheema opined that Habschied suffered from moderate[2] limitations in his ability to follow, understand, and remember simple instructions and directions, perform simple and complex tasks independently, maintain attention and concentration for role tasks, regularly attend to a routine and maintain a schedule, and perform low stress and simple tasks. (*Id.*). Cheema also opined that Habschied was unable to participate in any activities other than treatment or rehabilitation for one year. (*Id.*).

Cheema's most recent opinion was dated April 29, 2016, and was contained on a SSA form entitled "Medical Source Statement Of Ability To Do Work-Related Activities (Mental)." (Tr. 381-83). Cheema opined that Habschied had no limitation in his ability to understand, remember and carry out simple instructions, was mildly[3] limited in his ability to make judgments on simple work-related decisions and interact appropriately with the public, and

---

[2] The form contained only three levels of functioning: normal, moderately limited and very limited. "Moderately limited" was defined as unable to function 10-25% of the time.

[3] "Mild" was defined to mean "a slight limitation in this area, but the individual can generally function well." (Tr. 381).

was moderately[4] limited in his ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*). Cheema attributed Habschied's limitations to his depression and anxiety. (*Id.*).

At the ALJ's request, Sharon R. Kahn ("Kahn"), PhD, reviewed the available medical records, which included Lin's assessment and Cheema's treatment notes, and completed interrogatories related to Habschied's mental limitations. (Tr. 421-34). Kahn opined that Habschied suffered from bipolar disorder, cannabis use in alleged remission, mood disorder, and pseudoparkinsonism condition induced by medications. (*Id.*). According to Kahn, Habschied suffered from moderate limitations in his ability to engage in activities of daily living, maintain social functioning, and maintain concentration, persistence or pace. (*Id.*). She determined that his impairments did not meet or equal a listed impairment. (*Id.*).

Kahn opined that when using marijuana Habschied suffered from mild limitations in his ability to understand, remember, and carry out simple instructions, and moderate limitations in his ability to make judgments on simple work-related decisions, understand, remember and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors or coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*). According to Kahn, Habschied's difficulties were caused by the amotivational effects of marijuana use and that his motivation would improve, along with his memory, concentration, and mood, if he were to stop consuming marijuana. (*Id.*).

---

[4] "Moderate" was defined to mean "more than a slight limitation in this area but the individual is still able to function satisfactorily." (Tr. 381).

Kahn further opined that if Habschied stopped consuming marijuana he would suffer no limitations in his ability to engage in simple work-related tasks and to interact appropriately with others, as well as adapt to changes in a work setting. (*Id.*). According to Kahn, Habschied would continue to have mild limitations in his ability to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions. (*Id.*).

On May 21, 2016, M. Saleem Ismail ("Ismail"), MD, conducted a complete psychiatric evaluation of Habschied. (Tr. 435-37). Habschied reported that he was interested in obtaining an evaluation due to poor memory. (*Id.*). He indicated that he had difficulty remembering names of people he had not seen recently and recalling old memories, including events and conversations. (*Id.*). He also endorsed repeating questions, misplacing things, a decreased sense of direction, and difficulty with his finances. (*Id.*). He reported that his mother assisted him with his laundry, cooking, and cleaning. (*Id.*). Habschied indicated that he had not been employed for at least two years and was not ready to return to work due to a lack of motivation. (*Id.*).

Upon evaluation, Ismail noted that Habschied was calm, cooperative, attentive, communicative, but slow to respond, with a quiet demeanor. (*Id.*). He demonstrated signs of mild depression, and his posture and attitude conveyed an overall depressed mood. (*Id.*). Habschied reported that he was not as depressed as he used to be, and he demonstrated intact associations and logical and coherent thought content. (*Id.*). His insight and judgment were fair, with no signs of anxiety or abnormal gross motor behavior. (*Id.*). Ismail assessed Habschied's vocabulary and fund of knowledge to indicate cognitive functioning in the borderline range.

(*Id.*).  Ismail administered the Patient Health Questionnaire ("PHQ"), and Habschied's responses indicated mild depression.  (*Id.*).

Ismail opined that the structured examination did not demonstrate that Habschied exhibited any major impairment that would justify characterizing his professed difficulties as a cognitive syndrome.  (*Id.*).  Ismail felt that Habschied's daily life lacked structure and motivation, and he encouraged Habschied to engage in daily routines, maintain a structure, and employ better sleep hygiene.  (*Id.*).  Ismail opined that Habschied would likely have difficulty multitasking or performing complex time-limited tasks.  (*Id.*).  Ismail believed Habschied might benefit from increased medication and behavioral intervention to address his depression.  (*Id.*).

The heart of Habschied's challenge to the ALJ's decision is that the ALJ improperly gave greater weight to some of the medical opinions of record (Kahn, Selesner, and Cheema's 2016 opinion), while discounting other opinions (Cheema's earlier opinions and Lin's opinion).  (Docket ## 13-1 at 16-34; 17).  In making this argument, Habschied compares the various medical opinions, identifies purported inconsistencies among them, and argues that the ALJ erred by not adequately articulating his rationale for the differing treatment the opinions received.

In his decision, the ALJ gave more weight to the opinions of Selesner, Kahn and Cheema's April 2016 opinions, finding that they were consistent with each other and with the record as a whole.  (Tr. 23-24).  He gave less weight to Lin's opinion, noting that Lin's clinical observations – based upon a single-visit – were inconsistent with the clinical findings contained in the treatment notes.[5]  (Tr. 25).  The ALJ gave "somewhat" less weight to Cheema's earlier

---

[5]  Habschied maintains that the specific page cited by the ALJ for the proposition that Habschied was cooperative with normal concentration and intact memory actually references a treatment note for a day on which a session was not actually conducted.  (Docket # 13-1 at 33).  Yet, the Strong Recovery notes containing this reference are replete with other references to Habschied's cooperative attitude, normal concentration, and intact memory.

opinions, reasoning that Cheema's earlier opinions did not utilize an SSA form[6] and, in any

event, Cheema's 2016 opinion was more consistent with the record as a whole. (Tr. 25).

According to the ALJ, Cheema's 2016 opinion was consistent with Kahn's and Selesner's

opinions, as well as the clinical findings repeated throughout the record. (Tr. 24).

Habschied argues that the ALJ failed to provide good reasons for the differing

weights accorded to the various opinions in the record and that this error was not harmless

because the earlier opinions of Cheema and Lin's opinion, if properly credited, support a finding

of disability. I disagree. As an initial matter, with the exception of Lin's opinion relating to

stress discussed below, all of the medical opinions of record assess, at most, moderate limitations

in work-related activities due to Habschied's mental impairments. The ALJ's decision

recognized that Habschied suffered from some work-related limitations due to his mental

impairments, and accounted for those limitations by limiting Habschied to simple work,

"requiring performance of a few routine and uninvolved tasks over and over again according to

set procedures, sequence or pace, with little opportunity for diversion or interruption." (Tr. 23).

Such limitations are consistent with the moderate work-related limitations identified by Lin and

(Tr. 719, 755, 772, 888). He also argues that the ALJ cited portions of Ismail's evaluation demonstrating only mild objective findings, while ignoring other portions of the evaluation. (Docket # 13-1 at 32). I disagree. The bulk of the information that Habschied attributes to Ismail's evaluation appears to be his self-report. (*Id.* (citing Tr. 435-36)). During the evaluation, Ismail noted only mild signs of depression and no objective indications of a cognitive impairment. (Tr. 436). Ismail also indicated that Habschied appeared to lack motivation and structure and would benefit from a daily routine. (*Id.*). Ismail opined that increased treatment or medication might assist Habschied with his mild depression and improve his motivation. (*Id.*).

[6] Specifically, Cheema's earlier opinions were contained on Monroe County Department of Human Services forms. (Tr. 384-96). On those forms, moderate limitations – the lowest category available for a treatment provider to indicate limitations in a given functional area – was defined to indicate an inability to function 10-25% of the time. (*Id.*). In contrast, Cheema's 2016 opinion was rendered on an SSA form that defined moderate to indicate more than a slight limitation in a particular functional area but that the individual would still be able to function satisfactorily. (*Id.*). This definition, as noted by the ALJ, is more consistent with the term as used in SSA regulations and guidance relating to mental impairments. *See* 20 C.F.R. Subpt. P, App. 1, § 12.00(F)(2)(c) (defining moderate as "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is fair").

Cheema. *See, e.g.*, *Martinez v. Comm'r of Soc. Sec.*, 2017 WL 2633532, *7 (N.D.N.Y. 2017) (finding RFC determination for unskilled work is not necessarily inconsistent with moderate mental limitations); *Patterson v. Colvin*, 2015 WL 5036934, *11 (W.D.N.Y. 2015) (ALJ's RFC limiting plaintiff to unskilled work adequately accounted for moderate mental limitations assessed by physicians); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 315 (W.D.N.Y. 2013) (finding RFC determination limiting claimant to simple, routine, repetitive tasks was consistent with ALJ's assessment that claimant had moderate difficulties with concentration, persistence, and pace).

Contrary to Habschied's assertion, an inability to perform certain tasks approximately ten percent of the time does not mandate a finding of disability.[7] *See Mitchell v. Colvin*, 2017 WL 3188582, *17 (W.D.N.Y. 2017) ("an inability to maintain concentration or attention for up to ten percent of the day does not preclude competitive employment") (collecting cases). Accordingly, while the ALJ could have more fully explained his rationale for the differing weights he gave to the various medical opinions, I find that any failure to do so was ultimately harmless because his RFC is consistent with, and supported by, all of the medical opinions of record. *See Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a greater weight, it would not have affected his RFC").

---

[7] As already indicated, the definition of moderate contained on the forms completed by Cheema in 2014 and 2015 indicated an inability to perform for approximately 10-25% of the time. I agree with Habschied that an inability to remain on task for approximately twenty percent of the workday or more would likely preclude competitive employment. Yet, as previously indicated, moderate was the lowest possible level of impairment available for physicians completing the form to indicate that there was *any* level of impairment in a particular work-related task. The record, including Cheema's treatment notes which generally indicated that Habschied was doing well, does not support the conclusion that Habschied would generally be off-task in excess of ten percent of the workday.

As noted above, the only limitation arguably not accounted for in the ALJ's RFC was Lin's assessment that Habschied suffered from marked limitations in his ability to appropriately deal with stress. (Tr. 327). That limitation, however, was properly rejected by the ALJ as inconsistent with all of the other medical opinions contained in the record, including all of Cheema's opinions. Indeed, neither Kahn or Selesner, nor Cheema, Habschied's treating psychiatrist, assessed greater than moderate limitations in any area of work-related functioning, including those areas associated with Habschied's ability to manage work-related stress. (Tr. 64-69, 381-96, 422-30).

Not only is the ALJ's RFC consistent with and supported by the medical opinions contained in the record, but it is also consistent with and supported by the record as a whole. Although the record plainly reflects that Habschied suffered from mental impairments that affected his ability to engage in more complex work-related activities, a longitudinal review of his medical treatment demonstrates relatively minor limitations and general improvement with treatment. Cheema's treatment notes reflect that Habschied generally responded well to medication, although some adjustments were required over time, particularly due to a tremor-causing side effect of Abilify. (Tr. 333-39, 343-44). Strong Recovery notes demonstrate consistent participation by Habschied and, although he suffered some relapses, he was ultimately successful in the program and able to abstain from marijuana use. (Tr. 508-989). The treatment records further suggest that many of Habschied's treatment providers felt that he would benefit from the structure provided by employment. (Tr. 435-37, 540, 709).

The record further demonstrates that Habschied was able to participate in many activities of daily living, including caring for his elderly parents, including his father who had suffered a stroke, caring for a dog, caring for his own personal hygiene, preparing simple meals,

performing household chores, including painting and yard work, and going shopping. (Tr. 220-28, 327, 477, 544). Despite his social interaction limitations, Habschied maintained friendships and dated. (Tr. 695, 709, 770, 787, 798, 816, 839, 919). In July 2016, he reported that he had a girlfriend. (Tr. 489). Throughout his recovery treatment, Habschied frequently commented about missing work and wanting to return to employment. (Tr. 540, 590, 729, 745). He also reported caring for his elderly parents, providing support to both his mother and father after his father's stroke, and performing chores around the house, including spring cleaning and preparing the house for summer. (Tr. 477, 544, 549, 581, 603, 616, 698, 727, 731, 973).

Nothing in the record suggests that Habschied is unable to perform simple work with the limitations identified by the ALJ. Indeed, as discussed above, the record reflects that Habschied was able to perform significant activities of daily living, engage in social interactions, successfully participate in recovery treatment, and care for his elderly parents. Further, all of the medical professionals who examined Habschied or reviewed his medical records have assessed only mild to moderate limitations, and his treatment records reflect that he responded well to treatment and rehabilitation. Although he has not been employed in several years, he has expressed interest in returning to work, and he ended his prior employment voluntarily after failing a drug test. (Tr. 540, 590, 729, 745, 771). I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

I find that the ALJ's RFC properly accounted for Habschied's mental limitations by limiting him to simple work involving "a few routine and uninvolved tasks over and over again according to set procedures, sequence or pace, with little opportunity for diversion or interruption." (Tr. 23). The ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013) ("[u]pon our independent review of the existing record, including [the consultative examiner's opinion] and the treatments notes from [plaintiff's] doctors, we conclude that the ALJ's residual functional capacity determination was supported by substantial evidence").

In addition to challenging the basis for the ALJ's determination to give differing weights to the various opinions of record, Habschied also challenges the ALJ's determination to rely at all upon the opinions of Selesner and Kahn, maintaining that they were rendered by non-examining physicians and were stale because they had been completed prior to submission of a significant portion of the medical record. (Docket # 13-1 at 22-24, 26-27). With respect to Selesner, his report was authored on May 8, 2014, at which time the only records available for review were Cheema's treatment notes for the period July 3, 2008 through March 11, 2014, and Lin's consultative report. (Tr. 285-324, 325-28). Thus, Selesner did not have the benefit of reviewing more recent treatment notes from Cheema for the period August 26, 2014 through March 25, 3016, any of Cheema's opinions, Kahn's interrogatory responses, the evaluation conducted by Ismail on May 21, 2016, treatment notes from Habschied's primary care physician, or any of the treatment notes from Strong Recovery. (Tr. 332-43, 381-96, 422-34, 435-37, 471-507, 509-989). Similarly, prior to completing the medical interrogatories, Kahn did not review Ismail's evaluation, treatment notes from Habschied's primary care physician, or the treatment notes from Strong Recovery. (Tr. 435-37, 471-507, 509-989).

As an initial matter, to the extent that Habschied maintains that the ALJ was not entitled to rely upon the opinions of Selesner and Kahn because they reviewed his medical records without conducting an in-person evaluation, I disagree. *See King v. Comm'r of Soc. Sec.*, 2016 WL 6833058, *4 (N.D.N.Y.) ("[i]t is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability"), *report and recommendation adopted by*, 2016 WL 6833991 (N.D.N.Y. 2016). Further, although Habschied is correct that "a medical opinion that would otherwise constitute substantial evidence may be rendered stale or invalid because it is based upon an incomplete record or fails to account for a deterioration in a claimant's impairment," I find that the ALJ did not err in relying on the opinions of Kahn and Selesner, despite the fact that they did not have the entire medical record when they rendered their opinions. *See Miller v. Colvin*, 2016 WL 4478690, *12 (W.D.N.Y. 2016).

Contrary to Habschied's contentions, nothing in the subsequently submitted records demonstrates that his condition deteriorated. To the contrary, Ismail's evaluation revealed only mild depression and no objective evidence to suggest that Habschied suffered from a cognitive syndrome causing any memory difficulties. (Tr. 435-37). Although Ismail opined – consistent with the other medical opinions in the record – that Habschied may have difficulty performing complex tasks, he encouraged him to engage in daily routines with structure.[8] (*Id.*). Similarly, the Strong Recovery records demonstrate that he was generally stable in his recovery,

___

[8] Although Habschied maintains that he was "referred to Dr. Ismail due to having difficulty with directions, forgetting people's names, and not remembering or recalling old memories despite being abstinent from marijuana for 7 months" (Docket # 13-1 at 22), his treatment notes suggest that he requested the evaluation from Ismail based upon the recommendation of his attorney (Tr. 487). Further, treatment notes suggest that Habschied was interested in finding a new psychiatrist during this same period of time because Cheema was "not supporting him in not working right now." (Tr. 709, 726).

with the exception of relapses during periods of situational distress, particularly his father's stroke and subsequent declining health. (Tr. 509-989). Overall, Habschied indicated that his mood and functioning had improved. (Tr. 726). Indeed, the Strong Recovery notes demonstrate that he was actively assisting in caring for his parents and their home, and was interested in obtaining employment. (Tr. 724, 727, 729, 731, 745). Thus, my review of the records suggests that the subsequently submitted records are consistent with the records reviewed by Kahn and Selesner, and, if anything, demonstrate an overall improvement in Habschied's mood and functioning. Accordingly, I conclude that the opinions of Kahn and Selesner were not stale and, in addition to the record as a whole, provide substantial evidence to support the ALJ's determination.

Habschied maintains that even if the ALJ properly relied upon Selesner's opinion, he failed to account for the single limitation identified by Selesner – that Habschied "would likely benefit from a work setting in which he would have limited interactions with co-workers." (Docket # 13-1 at 26-27). As an initial matter, the ALJ's RFC recognized that Habschied suffered from some limitation in his ability to interact with others, but concluded that he was capable of interacting with others in the context of performing simple work. (Tr. 23). In any event, the ALJ determined that Habschied was able to return to his previous position as an automobile detailer. (Tr. 26). The Dictionary of Occupational Titles ("DOT") provides a code, numbered 0-8, for the type of social interaction each occupation requires. *See Race v. Comm'r of Soc. Sec.*, 2016 WL 3511779, *5 n.4 (N.D.N.Y.), *report and recommendation adopted by*, 2016 WL 3512217 (N.D.N.Y. 2016). The automobile detailer position lists the type of social interaction required as 8, which is described as "attending to the work assignment instructions or order of supervisor[;] [n]o immediate response required unless clarification of instructions or

orders is needed," and the degree of relation to people is "not significant." *See* DOT

915.687-034, 1991 WL 687878 (1991); *Call v. Comm'r of Soc. Sec.* 2017 WL 2126809, *5

(N.D.N.Y. 2017); *Race v. Comm'r of Soc. Sec.*, 2016 WL 3511779 at *5 n.4. Accordingly, the

position of automobile detailer does not require significant interaction with others. *See Call v.*

*Comm'r of Soc. Sec.* 2017 WL 2126809 at *5; *Race*, 2016 WL 3511779 at *5 n.4.

Habschied also challenges the ALJ's reliance on Kahn's opinion for several

additional reasons. (Docket ## 13-1 at 20-26; 17 at 2-3). First, he maintains that Kahn

improperly provided an opinion outside her expertise by indicating that Habschied's previous

employment was a "skilled" position and that she improperly considered his functioning prior to

the alleged onset date. (Docket # 13-1 at 24). There is nothing to suggest that these purported

errors were material to the ALJ's decision or that they detract in any way from the substantial

evidence in the record supporting the ALJ's decision. Indeed, the ALJ's decision acknowledged

that Habschied's previous employment was unskilled. (Tr. 26). Accordingly, these purported

errors are not a basis for remand.

Habschied also maintains that although Kahn's opinion purports to rely upon

Cheema's treatment notes and Lin's evaluation, neither of those sources support the limitations

that she assessed. (Docket # 13-1 at 20-22). I disagree. As explained above, Lin's opinion

identifying generally moderate limitations is consistent with Kahn's opinion that Habschied

suffered from mild limitations in his ability to perform simple work and moderate limitations in

his ability to perform complex work and interact appropriately in a work setting. (*Compare*

Tr. 325-28 *with* 428-29). Further, Cheema's treatment notes demonstrate that Habschied

responded positively to medication management over time and that his mood generally improved with treatment.[9]  (Tr. 333-39, 343-44).

Finally, in his reply submission, Habschied suggests that reliance upon Kahn's opinion was improper because information in a decision in another case suggests that Kahn is biased against claimants with mental health impairments.[10]  (Docket # 17 at 1-3 (citing *Weston v. Colvin*, 2017 WL 4230502 (W.D.N.Y. 2017)).  First, this "argument[] appear[s] procedurally barred because [Habschied] failed to raise [it] in [his] opening brief."  *Patterson v. Colvin*, 2015 WL 5036934 at *13.  While the *Weston* decision raises serious concerns, *see Westin v. Colvin*, 2017 WL 4230502 at *4-6, in this case, even if the ALJ erred by relying upon Kahn's opinion, such error was harmless because, as discussed at length above, substantial other evidence in the record supports the ALJ's determination, including the other medical opinions of record.  *See Thomas v. Comm'r of Soc. Sec.*, 2015 WL 8274356, *6 (N.D.N.Y.) (any error in weight accorded to physician's opinion was harmless where the "ALJ also relied on other medical evidence in the record," including opinions of other physicians), *report and recommendation adopted by*, 2015 WL 8347185 (N.D.N.Y. 2015).

---

[9] Habschied also maintains that the ALJ failed to follow the proper proffer procedures for new evidence upon submission of the Strong Recovery records.  (Docket # 13-1 at 24-25).  According to Habschied, the ALJ properly provided notice to his counsel of the new evidence, but issued a decision prior to the expiration of the ten-day period to respond to the evidence set forth in the notice letter.  (*Id.*).  The record demonstrates that the ALJ sent notice on September 1, 2016, and issued his decision on September 19, 2016.  (Tr. 15-27, 282-84).  Although Habschied speculates that the ALJ actually issued the decision on September 14, 2016, based upon a notation in the Court Transcript Index, it is not clear to this Court that this notation was not a typographical error.  In any event, there is no indication that Habschied's counsel intended to but was unable to respond to the new evidence.  Further as discussed above, my review of the subsequently admitted records does not suggest that they are inconsistent with any of the other evidence contained in the record, including Kahn's opinion, nor does Habschied identify anything in the records that he wished to bring to the ALJ's attention.

[10] Nothing in the record suggests that the ALJ in this case had any reason to question Kahn's ability to fairly assess persons with mental impairments.

## <u>CONCLUSION</u>

This Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **GRANTED**. Habschied's motion for judgment on the pleadings **(Docket # 13)** is **DENIED**, and Habschied's complaint (Docket # 1) is dismissed with prejudice. **IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      March 26, 2019